UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DARLSON RUPERT,

                Plaintiff,

       v.

CITY OF ROCHESTER, DEPARTMENT OF
ENVIRONMENTAL SERVICES,

                Defendant.

_____

<u>DECISION & ORDER</u>

07-CV-6283P

## PRELIMINARY STATEMENT

Plaintiff Darlson Rupert ("Rupert") has sued the City of Rochester (the "City")

under the Age Discrimination in Employment Act ("ADEA") and the New York State Human

Rights Law ("NYSHRL"). (Docket # 1). Pursuant to 28 U.S.C. § 636(c), the parties have

consented to have a United States magistrate judge conduct all further proceedings in this case,

including the entry of final judgment. (Docket # 9). Currently pending before this Court is the

City's motion for summary judgment on Rupert's claims. (Docket # 15). The following

constitutes the decision and order of this Court.

## FACTUAL BACKGROUND

### I.  Rupert's Employment with the City

The following facts are undisputed except where otherwise noted. (*See* Docket

## 15, 19, 20). Rupert was born on January 27, 1951. In 1980, he began working for the City's

Department of Environmental Services ("DES") in its Solid Waste Division, where he remained

employed for twenty-six years until his retirement in 2006. He worked as an "Environmental Services Operator I" and was responsible for operating a truck used to empty litter baskets. Rupert received various awards and certificates of service during his years of service for the City, including awards for "Solid Waste Excellence" in 1997 and 2000 and the June Employee Recognition Team Award in 2003.

While employed with the City, Rupert was a member of Local 1635 of the American Federation of State, County and Municipal Employees (the "Union"). Non-uniformed union members, such as Rupert, were required to adhere to written standards of conduct (the "Standards of Conduct") promulgated by the City. Among other things, the Standards of Conduct prohibited engaging in personal work on City time, stealing City property, and using City property, including vehicles, "for private business or personal gain." (Docket # 15-4, Ex. D). The Standards of Conduct provided that "[f]or most offenses, a system of progressive discipline will be used [, . . . pursuant to which] employees [will be] warned in writing or given disciplinary suspensions, demotions or fines, not to exceed $100 for related offenses, before being given the penalty of discharge." (*Id.*). The Standards of Conduct further provided that progressive discipline would not be employed "[i]n cases of more serious offenses," for which "suspension, demotion, fines, and discharge" would be appropriate. (*Id.*).

During his tenure with the City, Rupert was disciplined on three occasions prior to the events leading to his retirement. In 1995 and 2000, he received written reprimands, the first for failing to punch in and the second for excessive use of sick time. In 2001, Rupert was suspended without pay for ten days for removing City property (a plow) without authorization and with intent to use it for personal purposes. In the letter notifying him of the suspension,

Rupert was cautioned that "any further infractions of th[at] nature [would] result in further disciplinary action." (*Id.* at Ex. B).

On July 24, 2006, Rupert drove his personal van and trailer into the gated work compound because a friend wanted to borrow the trailer. When he arrived, the trailer contained several large items, such as a basketball hoop and pieces of siding. Rupert removed the items from the trailer using a City "boom" truck and stored them in the boom truck until the next day. The following day, Rupert reloaded the items into his trailer and then paid to dispose of them at the City's dump.

On July 24, 2006, photographs depicting Rupert using the boom truck were left on Rupert's supervisor's desk. The supervisor asked Rupert to explain the photographs, and Rupert admitted his actions. Several days later, at his supervisor's request, he provided a written statement acknowledging his conduct. Specifically, the statement provided:

> I brought my trailer into work because a friend needed to use it. On my trailer I had a basketball stand, a chair and a stool with about 20 pieces of siding. When I got to work I put them into a boom truck because I was running to [*sic*] late to dump them. I didn't get my trailer back so I drove my truck in and took and emptied the boom of all the items and took them to the dump and paid to get rid of them.

(*Id.* at Ex. C). Rupert subsequently participated in a meeting to address his conduct, which was attended by the Commissioner of DES, Paul Holahan, two of Rupert's supervisors and two union representatives. At the conclusion of the meeting, Commissioner Holahan advised Rupert that his conduct "likely constituted a terminable offense" in view of his record of discipline for a prior similar offense. (Docket # 15-8 at ¶ 15).

Commissioner Holahan thereafter made the decision to terminate Rupert's employment and issued a letter to him, dated September 1, 2006, informing him that his employment would be terminated effective September 5, 2006 as a result of "the egregious nature of your conduct and your previous disciplinary history." (Docket # 15-5, Ex. E). The termination letter stated that Rupert had committed three violations of the Standards of Conduct, namely, (1) conducting personal work on City time; (2) stealing City property; and (3) using City vehicles without authorization "for private business or any personal gain." (*Id.*).

At Rupert's request, on September 8, 2006, the Union filed a grievance challenging and seeking recission of the termination decision. The grievance was filed under the terms of the applicable collective bargaining agreement between the Union and the City (the "CBA"), which provided that disciplinary determinations could be challenged through a grievance and, in the event that the grievance were not settled, could be taken to binding arbitration at the request of the Union or the City.[1] (Docket # 15-4, Ex. G at 53). As a result of the grievance filing, the City stayed Rupert's termination and placed him on unpaid suspension pending the outcome of the grievance process. In late September, the Union and the City negotiated a proposed settlement which would have permitted Rupert to retire on November 6, 2006, in return for a release of claims. (Docket # 15-4, Ex. H). Rupert did not sign the settlement agreement and instead retired on October 30, 2006 without an agreement. Because he

---

[1] The CBA further specified that at arbitration the employee had the right to representation, to present evidence, to cross-examine adverse witnesses and to submit written briefs and the City had the burden to prove just cause for the discipline. (Docket # 15-8 at ¶¶ 23-24).

retired, and was not terminated, he retained his health benefits.[2]  No further action was taken with respect to the grievance.

Rupert did not sign the settlement agreement because he did not wish to release any workers' compensation or unemployment insurance benefits claims against the City.[3] Rupert claims that at the time the Union proposed the settlement to him, his Union representative told him that "[t]hey were done[;] [t]his was what I got."  (Docket # 15-2, Ex. 3 at 48).  Rupert did not request arbitration, although he was aware of his right to request that the Union proceed to arbitration.  (*Id.* at 44, 49).  He was also aware that other employees had successfully negotiated "last chance" agreements permitting them to return to work after filing grievances challenging their termination decisions.  (*Id.* at 33-34, 41-43, 50).

Following Rupert's retirement, the City promoted a thirty-seven-year-old employee to Rupert's position.  The City and Rupert dispute whether that employee was the next eligible employee on the then-current list of eligible candidates.[4]

## II.  Similar Misconduct By Other Employees

During the course of Rupert's twenty-six-year employment with the City, other employees, as well as supervisors, in the Solid Waste Division brought personal trash to work for disposal.  Some of those employees evidently also used City vehicles to facilitate the disposal

---

[2]  At the time of his retirement, Rupert was fifty-five and eligible for retirement.  The CBA provided that in order to be eligible for health benefits in retirement, employees had to retire directly from active employment. (Docket # 15-6, Ex. G, Art. 13, Section 2).

[3]  Indeed, following his retirement, Rupert received both workers' compensation and unemployment insurance benefits.

[4]  Rupert contends that the written list submitted by the City on this motion (Docket # 15-4, Ex. I) was over one year old at the time Rupert was replaced and hence unreliable.

of that trash, as well as for other personal reasons.  Indeed, at his deposition, Rupert identified ten Solid Waste employees his age or older who routinely imported trash without incurring discipline.

In addition, the record on this motion contains affidavits from five former and current Solid Waste Division employees who personally engaged in such conduct without discipline.  Two of those five were older than Rupert at the time of the conduct.  All five affirm that the practice of using City equipment to dispose of personal trash was common among Solid Waste Division employees, although the time frame during which that conduct was prevalent is unclear.  Four of the five stopped working before Rupert's retirement.  The fifth states that employees were warned about the conduct after Rupert's retirement and does not indicate whether the conduct continued after that warning.

On August 22, 2005, the Solid Waste Division held a safety meeting, the written agenda for which contained a list of "reminders," including one stating, "Do Not Import Trash." (Docket # 15-7, Ex. X).  Rupert attended this meeting, but alleges that importation of trash was never discussed.

In early 2006, the Mayor of the City of Rochester created a new department, the Office of Professional Integrity, to investigate employee abuses of trust, such as personal work on City time and unauthorized use or theft of City property.  Coincident with the formation of the new office, the Mayor also appointed Holahan as the new DES Commissioner in January 2006.  At the time, supervisors were instructed to "vigilantly enforce" the City's Standards of Conduct and were warned to be "more diligent" in guarding against employee violations of them, especially the prohibitions against personal work on City time and theft or unauthorized use of City property.

A few weeks after Rupert's violation, in a monthly meeting of their division, Solid Waste employees were warned of the prohibitions against importing trash and bringing personal vehicles into the gated work compound.[5]

## III.  Discipline of Other Solid Waste Division and DES Employees

During the period 2000 through 2008, DES employed 1,414 individuals, of whom approximately 278, or twenty percent, were Rupert's age or older.  At the time of Rupert's retirement in 2006, DES's Solid Waste Division employed 122 individuals, fourteen of whom, or eleven percent, were Rupert's age or older.  At that time, eighteen percent of all DES employees were Rupert's age or older.

Between 2000 and 2008, fourteen other DES employees were disciplined for the same Standards of Conduct violations that led to Rupert's termination decision – theft of City property, unauthorized use of a City vehicle and personal work on City time.  None were specifically disciplined for bringing personal trash to work, although several were disciplined for

---

[5]  Rupert's motion papers contain a copy of an alleged email sent on June 14, 2007 by the Director of the Operations Division to his staff.  The email states:

> This morning I observed an Operation Supervisor unloading his pick up truck with debris into a roll off box at the Ops Center.  When confronted he told me it was from cleaning his yard up (outside of the city).  The roll of[f] is dumped at the transfer station at a cost of $42 per ton.  I will reinforce the city code and our policy for the last time.  No city employee is allowed to bring trash and debris from his/her residence to work for disposal.  They will be subject to a municipal code ticket and discipline.  Supervisors should be setting a "good" example!

(Docket # 19-6, Ex. Y).  This exhibit is unaccompanied by any affidavit sufficient to put this unauthenticated, hearsay evidence in admissible form.  *See Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 509-10 (2d Cir. 1989) (evidence relied upon to oppose motion must be admissible).  Even apart from that fatal deficiency, the record contains no evidence concerning the discipline imposed, if any, on the unnamed supervisor.

using City vehicles or conducting personal business on City time. Eight of the fourteen were disciplined after Commissioner Holahan's appointment in 2006.

Of the fourteen who were disciplined for violating the same Standards of Conduct as Rupert, four were terminated, all of whom were younger than Rupert. Two employees, also younger then Rupert, received termination notices that were subsequently converted into "last chance" agreements permitting them to remain employed. None of the remaining eight employees who were subject to a lesser form of discipline than termination had a record of discipline for a prior similar offense. Of these eight, three were the same age or older than Rupert,[6] and five were younger.[7]

From 2000 through 2006, forty-two DES employees (of whom twenty-three were Solid Waste Division employees) were terminated for violations different from those for which Rupert was terminated, five of whom were later permitted to return to work as a result of a grievance settlement. All forty-two were younger than Rupert. From 2006 through 2008, Holahan terminated twenty-six DES employees, twenty-one of whom were younger than Rupert, for violations different from Rupert's.

Rupert maintains that the City "had a practice of terminating [older] employees, negotiating with the union, and then hiring them back until their [fifty-fifth] birthdays or forcing them to retire if they already reached that age." (Docket # 19-7, Ex. C at ¶ 41). In support, Rupert names five employees who were terminated and, after negotiating with the union, were permitted to retire or to keep working until they reached retirement age. The City contends that

---

[6] Of these three, two received five-day suspensions, and the third received a written reprimand.

[7] Of these five, one received a five-day suspension, two received three-day suspensions, one received a $100 fine, and one received a written reprimand.

each was terminated for misconduct and "rather than taking grievances over the terminations to arbitration, [the union] negotiated agreements for each of [those five employees which] allow[ed] them to return to work until they reached retirement age." (Docket # 15-9 at ¶ 50). Neither party has submitted affidavits from any of the five addressing the circumstances of their retirement.[8]

## **DISCUSSION**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, the court must assess whether there exist any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the nonmoving party must come forward with

---

[8] Indeed, both parties rely on an affidavit submitted by one of the five, Dan Barbarito, addressing other issues in the case, but which is silent as to his retirement. (*See* Docket # 15-2 at Ex. 5, # 19-7 at Ex. F).

sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d at 982 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:
>
> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution . . . . [I]t must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).


## I. <u>Prima Facie Case of Discrimination Under the ADEA</u>

Here, Rupert has brought this suit under the ADEA and the NYSHRL. Both the ADEA and the NYSHRL prohibit discrimination in employment on the basis of age, *see* 29 U.S.C. § 623(a)(1); N.Y. Exec. Law § 296, and claims under the NYSHRL are analyzed under the same legal framework as ADEA claims. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.1 (2d Cir. 2009) (citing *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 114 n.3 (2d Cir. 2007)).

The Supreme Court recently held that a plaintiff asserting an age discrimination claim under the ADEA "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009). In other words, an ADEA claim may not be proven by evidence that "age was simply a motivating factor" in an adverse employment decision. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. at 2349.

Although the Supreme Court in *Gross* did not address whether the *McDonnell Douglas* framework is still applicable in ADEA cases, the Second Circuit has since answered that question in the affirmative.[9] *See Wellesley v. Debevoise & Plimpton LLP*, 346 F. App'x 662, 662 (2d Cir. 2009) ("[i]n this Circuit, ADEA claims are evaluated under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)"). *Accord Leibowitz v. Cornell Univ.*, 584 F.3d at 498-99. As the Second Circuit has noted, the purpose of the *McDonnell Douglas* framework is to evaluate whether a rational "fact finder could conclude that age-related animus was the 'but-for' cause of [p]laintiff's termination." *Wellesley v. Debevoise & Plimpton LLP*, 346 F. App'x at 663. Under the framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff satisfies this initial burden, the burden shifts to the defendant to offer a legitimate, lawful reason for its action. Once a lawful, non-discriminatory explanation is articulated, the burden shifts back to the plaintiff to raise a triable issue of fact that the

---

[9] Even before *Gross*, the Supreme Court acknowledged that "[w]e have never had occasion to decide whether the application of the Title VII [*McDonnell Douglas*] rule to the ADEA context is correct." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996).

defendant's proffered reason is merely a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-08 (1993).

To establish a prima facie case under the ADEA, a plaintiff must show: "membership in the protected age group, qualifications for the job[] at issue, an adverse employment action, and that the adverse action occurred under circumstances giving rise to an inference of discrimination." *D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003)). The plaintiff's burden in establishing a prima facie case is "minimal." *Carlton v. Mystic Transp., Inc*., 202 F.3d 129, 134 (2d Cir.) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 506), *cert. denied*, 530 U.S. 1261 (2000).

In this case, the City concedes, and I agree, that Rupert has adduced sufficient evidence to show that he is a member of the protected class (employees aged 40 or order) and that he was qualified for his job. The City disputes, however, that Rupert has established a prima facie case that he suffered an adverse employment action or that such action occurred under circumstances giving rise to an inference of discrimination. I turn first to the question of adverse employment action.

## A. Adverse Employment Action

Rupert contends that he suffered the following adverse employment actions: termination, suspension without pay and constructive discharge. (Docket # 19-9 at 7). As the Second Circuit has held,

> [a]n adverse employment action is one which is more disruptive
> than a mere inconvenience or an alteration of job responsibilities.
> Examples of materially adverse changes include termination of
> employment, a demotion evidenced by a decrease in wage or
> salary, a less distinguished title, a material loss of benefits,

> significantly diminished material responsibilities, or other indices
> ... unique to a particular situation.

*Terry v. Ashcroft*, 336 F.3d at 138 (internal citations and quotations omitted).

      **1. Termination**: The record in this case demonstrates that Rupert was not in fact terminated. Although he was notified of the City's decision to terminate him, before that decision became effective, Rupert filed a grievance challenging it. As a result of the filing, the City stayed the termination pending the outcome of the grievance process and instead placed Rupert on unpaid suspension. Rupert thereafter retired from employment. That he retired and was not terminated is further evidenced by his retention of health care benefits following his separation from the City – a benefit available only to employees who retired directly from active status.

      **2. Suspension Without Pay**: A suspension without pay qualifies as an adverse employment action. *See*, *e.g.*, *Silverman v. City of New York*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) (thirty-day suspension without pay); *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 284 (S.D.N.Y. 2000) (six-day suspension without pay) (collecting cases).

      When the City stayed its termination decision pending resolution of Rupert's grievance, it instead placed him on unpaid suspension. Rupert remained suspended without pay until October 30, 2006, the day he retired. This fifty-five day suspension without pay plainly qualifies as an adverse employment action under the ADEA and the NYSHRL.

      **3. Constructive Discharge**: Whether Rupert has established constructive discharge is a much closer question. "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Lopez v. S.B. Thomas, Inc.*, 831

F.2d 1184, 1188 (2d Cir. 1987) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)) (internal quotation omitted). To determine whether an individual has been constructively discharged, a court must consider (1) "whether plaintiff's employers deliberately created unbearable working conditions for the purpose of forcing plaintiff to resign; and (2) whether reasonable person in plaintiff's position would have felt compelled to resign." *Stembridge v. City of New York*, 88 F. Supp. 2d at 284 (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir. 1993)). A triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired. *See*, *e.g.*, *Lopez v. S.B. Thomas, Inc.*, 831 F.2d at 1188-89 (citing *Welch v. Univ. of Tex.*, 659 F.2d 531, 533-34 (5th Cir. 1981) ("finding constructive discharge where employer clearly expressed his desire that employee resign because such statement would force a reasonable person to resign").

Here, Rupert alleges that the City clearly expressed its intention to terminate him upon the conclusion of the grievance process. (Docket # 19-9 at 8-9). Specifically, Rupert maintains that he had no genuine choice but to reject the proffered settlement agreement negotiated by the Union on his behalf because it would have required him to relinquish a valid workers' compensation claim. He also asserts that he had no choice but to retire because he reasonably understood that his union would not take his grievance to arbitration.

The City counters that Rupert cannot establish that he was constructively discharged because he did not request arbitration even though he knew he had the right to do so and was aware that arbitration had resulted in "last chance" agreements for other employees. In advancing this contention, the City cites cases foreclosing claims of constructive discharge where the employee did not take advantage of employer-provided opportunities to challenge the allegedly intolerable working conditions, such as contractual rights to grieve and arbitrate

disciplinary decisions.  *See*, *e.g.*, *Bailey v. New York City Bd. of Educ.*, 536 F. Supp. 2d 259, 266, 266 n.9 (E.D.N.Y. 2007) ("when an employee resigns rather than responds to disciplinary charges, the resignation cannot later be construed as a constructive discharge[;]" nor can "[t]he fact that termination was one possible outcome of the hearing"); *Silverman v. City of New York*, 216 F. Supp. 2d at 116 ("the fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation"); *Katz v. Beth Israel Med. Ctr.*, 2001 WL 11064, *13 (S.D.N.Y. 2001) (no constructive discharge where employee voluntarily resigned instead of filing grievance pursuant to collective bargaining agreement); *Stembridge*, 88 F. Supp. 2d at 284-85 (no constructive discharge where employee failed to avail himself of right to appear with counsel at informal conference to challenge suspension without pay; "in light of the fair hearing and opportunity to be heard before an independent arbiter, a rational jury could not plausibly find that a reasonable person in plaintiff's situation would have felt compelled to resign").  In none of these cases was the plaintiff-employee subject to automatic termination in the event that he or she chose not to grieve the decision, as Rupert was in this case.

Even if the above-cited authority may be interpreted to apply to the circumstances presented in this case, which is an unsettled proposition at best, a close question exists whether Rupert has adduced sufficient evidence to raise a triable issue of fact that a reasonable person in his position would have felt compelled to retire rather than to seek arbitration.  No genuine issue exists that Rupert did not specifically and directly request the Union to arbitrate his grievance.  Rather, he contends that he reasonably understood the statement by his representative that "[t]hey were done[;] [t]his was what I got" to amount to a refusal to arbitrate.  The City urges the Court to disregard the Union's representative's alleged statement, which is asserted only in

Rupert's self-serving affidavit, as inadmissible hearsay. The legal issue, however, is not whether the Union would in fact have agreed to a request to arbitrate, but whether a reasonable person in Rupert's position would have believed that the Union would refuse to do so and that retirement was therefore the only viable option.[10]

These legal and evidentiary issues are ultimately immaterial to my resolution of the pending motion. Even assuming that Rupert could prove a prima facie case of constructive discharge, I find, for the reasons discussed *infra*, that summary judgment for the City is warranted because he has not raised a triable issue of fact as to pretext.

### B. Inference of Discrimination

As the Second Circuit has stated, "[i]t is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: . . . the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Leibowitz*, 584 F.3d at 502 (collecting cases) (internal quotation omitted). "Generally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination." *Carlton v. Mystic Transp., Inc.*, 202 F.3d at 135 (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. at 313) (finding that plaintiff had adduced sufficient evidence of inference of discrimination where he was terminated and his duties were transferred to employees 18 and 25 years younger). *See also D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d at 195 (finding evidence that 49-year-old plaintiff was rejected for job that was offered to individual eight years younger was sufficient to support inference of discrimination); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 717 (2d Cir.

---

[10]  The challenged statement may thus be admissible as non-hearsay because it is not being offered to prove the truth of the matter asserted – whether the Union had in fact decided to terminate the grievance process.

1994) (plaintiff alleged sufficient evidence of inference of discrimination where he was replaced by a "new younger employee within one year of his termination"); *Montana v. First Fed. Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir. 1989) (finding that a 56-year-old plaintiff had adduced sufficient evidence where her duties were transferred to employees 30 years younger).

Here, it is undisputed that fifty-five-year-old Rupert was replaced by a thirty-seven-year-old male. Therefore, Rupert has established an inference of discrimination on that basis. I turn next to whether the City has provided a legitimate non-discriminatory reason for disciplining Rupert.

## II.  Legitimate Non-Discriminatory Reason for Discipline

Once a plaintiff has established a prima facie case of discrimination in violation of the ADEA, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for taking the adverse action against the employee. Here, the City alleges that it disciplined Rupert for using City equipment for his personal business, after having been suspended for prior similar conduct. As Rupert concedes, this reason is valid on its face. (Docket # 19-19 at 13). Therefore, the City has met its burden of production under this step of *McDonnell Douglas*.

## III.  Pretext

Finally, following the defendant's proffer of a legitimate, non-discriminatory reason for the challenged action, the plaintiff must prove that the proffered reason is a pretext for discrimination. The "plaintiff carries the ultimate burden of persuasion and must produce

evidence such that a rational finder of fact could conclude that the adverse action taken against [the plaintiff] was more likely than not a product of discriminatory animus." *Leibowitz*, 584 F.3d at 504. "Speculation and conclusory allegations do not demonstrate pretext." *Constantinescu v. Dentsply Equip.*, 1998 WL 146702, *6 (E.D.N.Y. 1998) (citing *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)), *aff'd*, 175 F.3d 1007 (2d Cir. 1999).

Rupert contends that he has adduced sufficient evidence to create a triable issue of fact as to pretext under the so-called "deviation theory." (Docket # 19-9 at 14). Under this theory, "departures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984)) (internal quotations omitted). Rupert maintains that when the City disciplined him, it deviated from its written *policy* of progressive discipline and from its usual *practice* of tolerating the conduct in which he engaged.

Rupert claims that Commissioner Holahan's decision to terminate him violated the progressive discipline policy because he was not first issued a written warning and given an opportunity to improve his performance. As an initial matter, even if the Standards of Conduct and the CBA may fairly be read to evidence the City's adoption of a policy of progressive discipline for "most offenses" (*see* Docket # 15-4 at Ex. D), Rupert has not shown that the violations for which he was disciplined fall within the category of violations for which progressive discipline is appropriate. The Standards of Conduct in effect at the time of Rupert's termination distinguished between "most offenses" – to which progressive discipline applied – and "serious offenses" – to which it did not; "serious offenses" were not defined in the

Standards. More importantly, Rupert had a prior suspension for the same conduct that led to his challenged termination – use of City property for personal purposes – and the existence of that disciplinary record was cited by Commissioner Holahan as justification for his termination. Rupert has identified no other employee with a history of discipline for a prior infraction of the same rule who was treated more leniently than he was upon the commission of a second like offense. These facts, rather than offering support for Rupert's argument of pretext, show no apparent deviation from a policy of progressive discipline.

Turning next to Rupert's argument that his discipline deviated from the City's customary practice of tolerating such conduct, he has adduced ample evidence that employees within the Solid Waste Division often brought their personal trash to work and used City equipment to facilitate its disposal. The record contains no evidence that any employee other than Rupert was disciplined specifically for that particular conduct. His contention that this disparate treatment is proof that age was the "but-for" reason behind his termination is undermined by the fact that older employees, as well as younger employees, engaged in the same conduct without discipline. Specifically, ten of the fourteen employees Rupert identified in his deposition as having imported trash were his age or older, and two of the five who submitted affidavits stating that they had engaged in the same conduct were his age or older. From these facts, no rational fact finder could infer that the City treated younger employees more favorably than older ones.

In addition, Rupert has adduced no evidence that older employees found to have violated the same category of violations of the Standards of Conduct as Rupert – personal work on City time, stealing City property and using City property for "private business or personal gain" – were disciplined more harshly than younger employees. The record contains evidence

19

that fourteen other DES employees were disciplined for the same Standards of Conduct violations as Rupert. Of the four who were terminated, all were younger than Rupert. The rest either converted their terminations into "last chance" agreements or received discipline less harsh than termination. Of the eight who were suspended, fined or reprimanded, they were almost evenly divided among employees younger than Rupert (five) and those the same age or older than Rupert (three). Unlike Rupert, none of the eight had records of prior discipline for the same offense.

Further, although Rupert has named five employees – presumably within the protected category of 40 or older – who he claims were "forced to retire," he has conceded that these employees were first terminated for misconduct and later negotiated settlement agreements with the City permitting them to retire or to return to work until they reached retirement age. (Docket # 15-2 at Ex. 3 at 41-43). He has produced no evidence suggesting that their agreements were not voluntarily reached. Nor has he come forward with any evidence suggesting that the disciplinary action taken against these employees deviated from the City's policies or procedures or was harsher than that taken against younger employees. To the contrary, if any inference at all may be drawn from the evidence, it is that the City's treatment of these five older employees was more lenient than of others. Thus, Rupert's claim that these five employees were forced to retire does not raise a triable issue of fact as to whether older employees were treated more harshly.

The record before the Court on this motion contains no evidence that Rupert was ever subject to age-related comments at work, let alone that age was even discussed or considered by Commissioner Holahan in connection with his decision to terminate Rupert's employment. Rather, plaintiff's claim of pretext, distilled to its essence, is that he was singled

out for discipline for conduct that was commonly practiced by members of the Solid Waste Division.  That evidence alone is insufficient, particularly where accompanied by proof that employees both older and younger than Rupert engaged in such conduct without discipline.  *See*, *e.g.*, *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("[e]ven if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment [because of his race] . . . is credited, [he] has 'done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race[,] . . . [which] is not sufficient'" to defeat motion for summary judgment) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)); *Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 284 (D. Conn. 2008) ("for the purposes of an age discrimination claim, the [p]laintiff must do more than demonstrate that [the decision-maker] somehow singled her out[;] [t]he [p]laintiff must also demonstrate that the motivation for the actions taken against her were based . . . on her age"); *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 281 (S.D.N.Y. 2008) (finding that [p]laintiff adduced "no evidence that [supervisor's] treatment or assessment of her was motivated by pregnancy" where supervisor "never said anything negative about plaintiff's pregnancy or anyone else's" and plaintiff "presented no evidence that [supervisor] treated other pregnant employees poorly") (emphasis omitted); *Coccareo v. AT & T Corp.*, 2005 WL 1711967, *5 (D. Conn. 2005) (granting summary judgment to employer on ADEA claims, finding that plaintiff could not show pretext on the basis of more favorable treatment of younger employees where evidence included proof that members of the protected class were also treated more favorably than plaintiff).

Moreover, Rupert's claim of pretext is devoid of any evidence that the individual who made the decision to terminate him, Commissioner Holahan, was ever aware of other employees who engaged in such conduct and chose to ignore or impose a lesser sanction for

violations committed by younger employees.  *See Iuorno v. DuPont Pharm.* Co., 129 F. App'x 637, 640 (2d Cir. 2005) ("[a] showing that similarly situated employees falling outside the protected class received more favorable treatment can serve as evidence that the employer's proffered legitimate non-discriminatory reason for the adverse job action was a pretext for unlawful discrimination, but only if the plaintiff shows that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself") (internal quotations and ellipsis omitted); *Weichman v. Chubb & Son*, 552 F. Supp. 2d at 283-84 (proof of pretext lacking where plaintiff offered no evidence that supervisor who terminated plaintiff was aware of younger employees' tardiness and chose to ignore it).  Indeed, the proof suggests that a greater emphasis on compliance with the Standards of Conduct occurred in 2006 following Holahan's appointment, and Rupert has come forward with no admissible evidence that the conduct for which he was disciplined remained prevalent following Holahan's appointment.  There is simply no proof that Rupert's discipline deviated from the City's policy of employee discipline as promulgated in the Standards of Conduct or as enforced by Commissioner Holahan, or that older Solid Waste Division or DES employees were treated more harshly than younger employees by him or anyone else.[11]  *Eng v. Beth Israel Med. Ctr.*, 1995 WL 469704, *4

---

[11]  Proof that a significant number of employees the same age as or older than the plaintiff remained on the job undermines the claim "that age was the determinative factor in [the plaintiff's] termination."  *Constantinescu v. Dentsply Equip.*, 1998 WL 146702 at *6 (granting summary judgment to plaintiff, noting that nine employees in plaintiff's department were over forty and five were older than plaintiff following plaintiff's termination).  *See also Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 540 (E.D.N.Y. 2006) (granting summary judgment to defendant, noting that "[p]laintiff's claim that she was discharged because of her age is further weakened by evidence of [defendant's] continued employment of individuals within the protected age group") (citing *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 1000 (E.D.N.Y. 1999)), *aff'd*, 245 F. App'x 42 (2d Cir. 2007); *Deshais v. Consol. Rail Corp.*, 956 F. Supp. 230, 238 (N.D.N.Y. 1997) (granting summary judgment to defendant, noting that many employees older than plaintiffs were retained following plaintiff's discharge).  In this case, at the time of plaintiff's retirement, eleven percent of the employees in the Solid Waste Division were his age or older and eighteen percent of DES employees were his age or older.  Only seven percent of DES employees terminated between 2000 and 2008 were the same age or older than Rupert.  This evidence further weakens Rupert's claim that he was terminated because of his age.

(S.D.N.Y. 1995) (summary judgment granted where plaintiff provided "no evidence that he was treated in a manner procedurally inferior to other [employees], nor evidence suggesting the reason for not suspending him was age discrimination").

In sum, a review of the record reveals nothing to indicate that the City's stated reason for terminating Rupert was pretextual. Rupert has submitted no evidence that would permit a rational fact finder to conclude that any reason other than that proffered by the City motivated the decision to terminate Rupert, let alone that Rupert's age was the "but-for" cause of his termination. Accordingly, Rupert has not met his burden to demonstrate that a triable issue of fact exists that his discipline was "more likely than not a product of discriminatory animus." *See Leibowitz*, 584 F.3d at 504. Thus, the City is entitled to summary judgment on Rupert's age discrimination claims.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment **(Docket # 15)** is **GRANTED**. Plaintiff's claims are hereby **DISMISSED**, and the Clerk of the Court is directed to enter judgment in favor of defendant and close the case.

**IT IS SO ORDERED.**

_____*s/Marian W. Payson*_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        March __30__, 2010